UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TINA M. BRIDGES, | ) | CAUSE NO. 3:11-CV-396-CAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On October 21, 2011, Plaintiff Tina Bridges (Bridges) filed her complaint in this Court.

On March 14, 2012, Bridges filed her opening brief requesting that this Court reverse and

remand this matter to the Commissioner for calculation of benefits. In the alternative, Bridges

seeks reversal of the Commissioner's decision and a remand for a new hearing and decision

consistent with the principles outlined in her brief. On April 25, 2012, Defendant Commissioner

of Social Security, Michael J. Astrue (Commissioner) filed his response brief. Bridges filed no

reply brief. This Court may enter a ruling in this matter based on the parties= consent, 28 U.S.C.

§ 636(c), and 42 U.S.C. § 405(g).

## I.    PROCEDURE

On July 26, 2006, Bridges filed her application for Title II Disability Insurance Benefits

(DIB) and Title XVI Supplemental Security Income pursuant to 42 U.S.C. §§ 416(i), 423

alleging a disability due to depression, fibromyalgia, and migraines beginning September 17,

2004 (Tr. 133–38).1 Her claims were denied initially on October 6, 2006, and also upon

---

1    The record shows that this was Bridges' second DIB and SSI application. Her previous application was denied
on March 8, 2006, with no appeal. The details of the first application are not discussed further here.

reconsideration on December 28, 2006 (Tr. 60–68, 71–84). Bridges appeared at a hearing before an Administrative Law Judge (ALJ) on October 31, 2008 (Tr. 11–28).

On April 17, 2009, the ALJ issued a decision holding that Bridges was not disabled (Tr. 51). The ALJ found that Bridges met the insured status requirements of the Social Security Act through December 31, 2008 (Tr. 40). The ALJ also found that Bridges had not engaged in substantial gainful activity since September 17, 2004, and her fibromyalgia, back pain, migraine headaches, and depression constituted severe impairments (*Id.*). However, the ALJ found that Bridges did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 41). The ALJ found that Bridges retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). However, she could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to workplace hazards including heights and machinery; and is unable to perform work activity that requires a fast pace or strict quota requirements (Tr. 42). The ALJ then found that although Bridges is unable to perform her past relevant work as a factory machine operator, there are jobs that exist in significant numbers in the national economy that Bridges can perform (Tr. 49).

On August 12, 2011, the Appeals Council denied review of the ALJ's decision making it the Commissioner=s final decision (Tr. 1–6). *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981. On October 21, 2011, Bridges filed a complaint in this Court seeking a review of the ALJ=s decision.

2

**II.    ANALYSIS**

A.    Facts

Bridges was a forty-five year old female at the time the ALJ denied her claims.  She has a ninth grade education and performed past relevant work as a machine operator at a factory.

1.    Claimant's Hearing Testimony

At the hearing, Bridges testified that she suffered from constant pain, migraine headaches, memory deficits caused by her medications, neck pain, fibromyalgia2 pain, and depression (Tr. 43).  In a typical day, she did little besides trying to ease her pain (*Id.*)  Bridges testified that she experienced two to three migraines per week each lasting all day and requiring her to lie down in a dark room with no noise.  She admitted that her migraines improved when she took Topamax3, although at times insurance problems prevented her from taking it and from pursuing further medical testing.  Bridges regularly treated her body pain with prescribed pain medications and other non-prescription treatments.  She indicated that she drove to the store a couple times a month, but that most of the time her sister drove her around and her live-in boyfriend grocery shopped (*Id.*).  Bridges also testified that pain prevented her from completing minor household chores (*Id.*).  As a result, Bridges mainly sat during the day and watched "some" television (*Id.*).  Bridges testified that she could sit for about fifteen to thirty minutes at a time, stand for about fifteen minutes at a time, and walk for about one-half block (*Id.*).  In addition, Bridges believed that she could lift about ten pounds (*Id.*).

---

2        Fibromyalgia is a common syndrome of chronic widespread soft tissue pain accompanied by weakness, fatigue, and sleep disturbances, the cause of which is unknown.  Stedman=s Medical Dictionary 725 (28th ed. 2006).
3        Topamax is prescribed to prevent migraine headaches.  *RxList:  The Internet Drug Index*, http://www.rxlist.com/topamax-drug/indications-dosage.htm (last visited July 29, 2012).

2.      Medical Evidence Regarding Headaches/Migraines

The record shows that Bridges first complained of headaches during a March 25, 2003, visit to her family doctor, Dr. Eric Jones (Tr. 238). Notes from chiropractic treatment between August 20 and October 8, 2004, show that Bridges did not complain of headaches during that time (Tr. 246–54). The record next shows that Bridges complained of headaches in a phone call to her subsequent family doctor, Dr. John Kennedy, on October 18, 2005 (Tr. 354). She attributed the headaches to an antidepressant that Dr. Kennedy previously prescribed. He prescribed a different antidepressant, and on December 22, 2005, Bridges told him during a visit for body pain that her headaches had lessened as a result of the medication change (Tr. 351).

Dr. Kennedy then referred Bridges to Dr. L. Blankenship, a neurologist at Central Indiana Neurology for fibromyalgia symptoms. During her first visit to Dr. Blankenship on January 4, 2006, Bridges complained of headaches "all the time," but the doctor's treatment notes only mentioned a frequency of two to three times per week (Tr. 336–37). Dr. Blankenship diagnosed Bridges with migraines and prescribed Topamax with a second medication to treat acute migraine symptoms. In an examination on February 18, 2006, by medical consultant Dr. Gul Kahn as part of her first disability application, Bridges denied headaches (Tr. 256–57). Bridges then told Dr. Blankenship on April 25, 2006, that her migraines had decreased in frequency with her use of Topamax with no side effects (Tr. 334, 390–91). On July 17, 2006, she reported only three migraines in the previous month to Dr. Blankenship (Tr. 335, 388–89). In September 2006, Bridges complained of migraines in a consultative psychological examination by Dr. Rebecca Wages, but the report did not describe the quality or the frequency

4

of the headaches (Tr. 305–09).  In a consultative examination with internist Dr. Brandon Dickey on September 16, 2006, Bridges claimed that she had a headache "all the time" (Tr. 300–04).  Then on October 25, 2006, Bridges reported only one to two migraines per week to Dr. Blankenship even though she had not been taking Topamax because of financial constraints (Tr. 333, 387).

Bridges' headaches arise next in the record in treatment notes from an April 17, 2007, visit to Dr. Blankenship (Tr. 384).  At that time, she was experiencing migraines two to three times per week leading Dr. Blankenship to reinitiate Topamax.  On July 23, 2007, Dr. Blankenship's notes stated that, "Topamax helps migraines greatly"  (Tr. 383).  Bridges also informed Dr. Blankenship that she was only taking the medication once rather than twice daily as prescribed and the results were "very effective."  Then during a January 21, 2008, follow-up visit to Dr. Blankenship, Bridges reported that her migraines were "OK" (Tr. 385).  Dr. Blankenship continued to renew Bridges' prescription for Topamax through her last visit with him in the record on July 18, 2008, at which time she indicated only two migraines per month (Tr. 382).

### 3.    Medical Evidence Regarding Pain and Fibromyalgia

Bridges first reported back pain and dizziness, along with headaches, to Dr. Jones, her family physician, on March 25, 2003 (Tr. 238).  Dr. Jones diagnosed headaches and neck pain and prescribed two pain medications.  Almost a year later on March 3, 2004, Bridges reported back pain, stomach aches, and stress with tearfulness to Dr. Jones leading him to diagnose

strained spinal muscles, chronic constipation, anxiety, and depression (Tr. 236).4 On July 14, 2004, Bridges underwent neck x-rays in response to her complaints of upper back pain. The x-rays showed nothing typically responsible for back pain such as misalignment of vertebrae, fractures or dislocations, joint inflammation or disc degeneration, or blockages of the nerves or blood vessels in the spinal canal (Tr. 244). However, Dr. Jones prescribed a new medication to address back spasms noted while examining Bridges on July 15, 2004 (Tr. 234). Bridges returned to Dr. Jones on July 19, 2004, complaining of neck pain for which he prescribed a new medication for short term relief of acute pain (Tr. 233). Bridges then underwent an MRI of the neck on July 21, 2004 (Tr. 243). The MRI showed minimal dryness of the discs between the vertebrae in the neck, but no bulging or protrusion of the discs and no spinal cord canal problems, such as blockages of nerves or blood vessels or narrowing (*Id.*). On August 23, 2004, Bridges complained to Dr. Jones that her right shoulder was popping with some numbness and tingling (Tr. 232). Shoulder x-rays completed the next day showed nothing in the bone structures or surrounding soft tissues to account for those symptoms (Tr. 242).

Bridges also underwent three chiropractic treatments from August 20 to October 8, 2004 (Tr. 246–54). During a September treatment, Bridges complained of minimal pain and indicated that she had worked two 10-12 hour shifts on September 3rd with little pain. At her last chiropractic visit, Bridges noted mild to moderate pain. The record then shows a gap in medical treatment until Bridges' first visit to Dr. John Kennedy, who became her primary physician.

---

4 This Court will not recite the medical evidence of Bridges' depression because she did not challenge the ALJ's decision based on that impairment. The record includes examinations by consultative psychologists Dr. J. Theodore Brown on February 1, 2006, and Dr. Rebecca Wages in September 2006, who both labeled Bridges' symptoms as moderate with GAF scores between 55-60. However, the ALJ found that Bridges' depression constituted a severe impairment and justified additional restrictions in Bridges' RFC (Tr. 49).

On August 1, 2005, Bridges visited Dr. Kennedy complaining of abdominal pain (Tr. 360). Dr. Kennedy referred Bridges to a specialist, but there are no records of any treatment from the specialist. Ten days later, Bridges returned to Dr. Kennedy for her annual pap examination with no mention of body pain (Tr. 357). On September 20, 2005, Bridges told Dr. Kennedy that she had been experiencing long-standing back and shoulder pain and that the back pain was worse at night (Tr. 356). Dr. Kennedy prescribed two pain medications and referred her to physical therapy (PT). She attended two PT sessions, which included rehabilitation exercise, but then missed two sessions. She was discharged from PT in October (Tr. 262–65). On October 4, 2005, Bridges visited Dr. Kennedy complaining of pain all over since starting PT (Tr. 355).

On November 15, 2005, Bridges told Dr. Kennedy that she was aching all over and was weak with a loss of energy (Tr. 353). Dr. Kennedy's exam showed generalized trigger points leading to a diagnosis of fibromyalgia. He renewed Bridges' prescriptions to treat her depression and pain. From November 2005, through March 12, 2007, Bridges regularly visited Dr. Kennedy. During that time, Dr. Kennedy found no change in her symptoms and continued to renew her prescriptions and identify multiple trigger points consistent with fibromyalgia.

While treating Bridges, Dr. Kennedy provided two reports asserting her disability. The first report, dated December 13, 2005, was a Credit Disability Insurance Claim Form completed in support of forgiveness of a loan (Tr. 352). Dr. Kennedy provided a diagnosis of "thoracic[5]

---

5      The "thoracic" area is the middle or core of the body including the upper and middle back but often used to refer to the ribs, lungs, and other organs located in the central part or thorax of the body.  *See* http://medical-dictionary.thefreedictionary.com/thoracic (last visited 29 July 2012); *Thoracic Spine Anatomy and Upper Back Pain, SPINE-HEALTH*, http://www.spine- health.com/conditions/spine-anatomy/thoracic-spine-anatomy-and-upper-back-pain (last visited 29 July 2012).

strain-chronic" due to a June 1998 car accident. He stated that she had been totally disabled since August 1, 2005. He estimated that her disability would continue for the next six months. Dr. Kennedy noted that there were no restrictions on Bridges' work activities.

The second report, dated August 18, 2006, was a Doctor's Statement regarding Bridges' disability required for insurance claim purposes (Tr. 299). Dr. Kennedy indicated that back pain, depression, and fibromyalgia—conditions for which he had been treating Bridges monthly—caused her disability. He did not indicate an onset date of the disability. When asked to estimate the number of months from the time of the report until she would be released to work, Dr. Kennedy checked the box labeled "12-?". He also checked a box labeled "unknown" in response to the question of whether Bridges was permanently disabled. However, Dr. Kennedy did not note any specific restrictions or limitations on Bridges' work-related activities.

Dr. Kennedy also referred Bridges to Central Indiana Neurology where the record shows that Dr. L. Blankenship, a neurologist, treated her regularly from January 4, 2006, until July 18, 2008. His treatment focused primarily on her migraine headaches, but he always included a fibromyalgia diagnosis in his notes. Bridges consistently described instances of shoulder and neck pain, numbness and tingling sensations, and fibromyalgia pain to Dr. Blankenship. On January 4, 2006, Bridges also complained she had been fired due to absences (Tr. 336–37). On October 25, 2006, Dr. Blankenship noted that his exam showed diffuse trigger points (Tr. 333).

In response to Bridges' applications for disability benefits, at least seven Social Security Administration medical consultants examined Bridges or reviewed her medical records. First, consultative psychologist Dr. J. Theodore Brown examined Bridges on February 1, 2006, in

response to her first application for benefits based on her fibromyalgia and indigestion conditions (Tr. 267–70).  His exam focused on Bridges' mental state, but his notes included a pain disorder diagnosis as part of her general medical condition.

Second, Dr. Gul Kahn, an internist specializing in rheumatology, examined Bridges on February 18, 2006 (Tr. 256–57).  During the exam, Bridges complained of pain primarily in the neck, arms, legs, and knees; joint pain at night; low-back pain at times; and stomach bloating. She denied headaches.  Dr. Kahn noted no acute distress and a normal neck/abdominal exam. Bridges demonstrated, however, a limp to avoid pain and an inability to walk heel-to-toe, on heels, or on tiptoes; squat; and stand from a squatted position.  She got on and off the exam table easily and had no problem using hands for manipulation.  Bridges exhibited reduced flexibility in the lower back but otherwise showed a normal range of motion.  Her straight leg raise test was negative for ruptured discs or nerve damage.  She had grip strength of 4/5; normal motor strength of 5/5; and normal reflexes.  She was neurologically intact and able to walk without an assistive device.  Dr. Kahn diagnosed Bridges with fibromyalgia affecting her arms, shoulders, neck, legs, knees, and ankles.  He provided no specific functional limitations on her work-related activities.

Third, medical consultant Dr. William Bastnagel reviewed Bridges' medical records in March 2006 (Tr. 290–97).  In his report, he noted Dr. Kahn's examination results.  He stated that Bridges could lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk about six hours; sit about six hours in an 8-hour day; and perform occasional postural movements.  Dr. Bastnagel specifically noted that these limitations were made in consideration

of her history of fibromyalgia.

Following Bridges' second application for disability benefits based on leg stiffness and full body pain, the fourth medical consultant, psychologist Dr. Rebecca Wages, conducted a mental status evaluation in September 2006, during which Bridges complained of pain all over due to fibromyalgia (Tr. 305–09). The fifth consultant, internist Dr. Brandon Dickey then examined Bridges on September 16, 2006 (Tr. 300–04). Bridges complained of full body pain for about one year with her leg pain getting a little worse. She informed him of her fibromyalgia diagnosis and her belief that her condition was more serious. Bridges said that she could walk about fifteen feet, stand about fifteen minutes, and carry about fifteen pounds. Dr. Dickey diagnosed fibromyalgia noting that Bridges appeared to be in pain throughout every part of the examination. He recorded that during the exam, Bridges had exhibited a limp and an inability to walk heel-to-toe, on heels, or on tiptoes because her legs hurt too badly. Her straight leg raise test was negative. Her joint exam was normal. She demonstrated intact sensation; grip strength of 5/5; a deficit in the range of motion of her lower back; and 4/5 strength in all four extremities. However, Dr. Dickey noted that Bridges' effort was questionable. He diagnosed fibromyalgia and indicated no specific functional limitations.

In October 2006, Dr. Andrew Reiners, the sixth medical consultant, reviewed Bridges' medical records in her disability application file to that date (Tr. 324–31). He found that she could lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk about six hours; and sit for about six hours in an 8-hour day. He also indicated that Bridges should never climb ladders, ropes, or scaffolding, but that otherwise she could perform occasional postural

movements.  Lastly, he noted that she should avoid concentrated exposure to hazards such as machinery and heights.  His report specifically noted the results of Dr. Dickey's examination plus Bridges' normal fine finger manipulation.  As part of the reconsideration of Bridges' application, Dr. F. Lavallo, the seventh consultant, reviewed all the record evidence and affirmed Dr. Reiners' opinion on December 27, 2006 (Tr. 324).

After the consultative examinations and reports, Bridges continued to seek treatment for her conditions.  On February 7, 2008, she established care with Dr. Kristine Rea, a rheumatologist (Tr. 371–72).  During that visit, Bridges complained of neck, shoulder, back, and knee pain.  Dr. Rea diagnosed secondary depression and advised Bridges to establish psychiatric care.  The record includes no evidence that Bridges pursued such treatment.  Bridges returned to Dr. Rea on May 5, 2008, and complained of pain and depression.  Dr. Rea noted 18/18 positive fibromyalgia tender points but stated that Bridges was not in acute distress with only minimal lower quadrant tenderness.  In addition, her straight leg raise test was negative for ruptured discs or nerve damage.  Dr. Rea also noted Bridges' depressed mood and prescribed an antidepressant.  Dr. Rea recorded that Bridges was having difficulty getting her medications and treatment due to her lack of insurance.  To address the pain symptoms, Dr. Rea strongly recommended that Bridges initiate an exercise program and informed her that her fibromyalgia would not improve without an increased activity level.  Dr. Rea asked that Bridges follow-up with her in two months.  However, there is no evidence of additional visits with Dr. Rea after May 15, 2008.

Bridges then visited Dr. Samuel Toney for the first time on June 20, 2008, after he took over Dr. Kennedy's practice (Tr. 374–80).  She visited Dr. Toney for help with pain

management complaining of leg pain, stiff legs after sitting too long, back pain, and neck pain, which she rated as 7/10 that day. Bridges stated that her pain was worse in the mornings and at night. Dr. Toney diagnosed fatigue and pain and prescribed medications for depression, inflammation, and pain including Topamax. Then on October 21, 2008, Dr. Toney completed a medical report for Bridges as part of her application for food stamps and temporary assistance (Tr. 396). In the report he indicated that Bridges could sit for two hours; stand for thirty minutes; walk for thirty minutes; lift, push, or pull twenty pounds; and grasp normally. He stated that she was unable to work four hours per day, five days per week and that she was restricted from bending. His primary diagnosis was osteopenia[6] with additional diagnoses of fibromyalgia, insomnia, depression, and migraines. He checked boxes on the form indicating that Bridges was unable to work, that her condition was permanent, and that she had attempted to return to work but found she could not.

C.     Standard of Review

In reviewing disability decisions of the Commissioner of Social Security, the Court shall affirm the ALJ=s decision if it is supported by substantial evidence and free of legal error. *See* 42 U.S.C ' 405(g) (2006); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). "Substantial evidence" is more than mere scintilla of relevant evidence that a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court is not to substitute its own opinion for that of the ALJ=s or

---

6      Osteopenia is a condition of decreased bone mineral density that is less severe than osteoporosis. *Osteopenia-Overview*, WebMD, http://www.webmd.com/osteoporosis/tc/osteopenia-overview (last visited 29 July 2012).

to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes*, 416 F.3d at 626. An ALJ=s decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ need not provide a "complete written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir.2004) (*quoting Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995)). An ALJ=s legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626.

To be entitled to disability insurance benefits under 42 U.S.C. § 423 or supplemental security income under 42 U.S.C. § 1381a, Bridges must establish that she is Adisabled.@ *See* 42 U.S.C. § 423(a)(1)(D). The Social Security Act defines Adisability@ as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant's impairment or combination of impairments is severe; (3) the claimant=s impairment meets or equals any impairment listed in the regulations and therefore is deemed so severe as to preclude substantial gainful activity; (4) the claimant is able to perform her past relevant work given her RFC; and (5) the claimant can adjust to other work in light of her RFC. 20 C.F.R.§§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If the ALJ finds that the claimant is disabled or not disabled at any step, he may make his

determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer at either step three or step five establishes a finding of disability. *Briscoe*, 425 F.3d at 352. At step three, if the impairment meets any of the severe impairments listed in the regulations, the Commissioner acknowledges the impairment and finds the claimant to be disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpart P, § 404. However, if the impairment is not so listed, the ALJ assesses the claimant=s RFC, which is then used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society under step five. 20 C.F.R. ' 404.1520(e)–(g). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Young*, 362 F.3d at 1000.

D.      Issues for Review

This Court must ascertain whether the ALJ's RFC determination for Bridges is supported by substantial evidence. Bridges argues that the ALJ's opinion does not support her RFC determination because (1) the ALJ improperly weighed the medical evidence of Dr. Kennedy, Dr. Toney, and the non-examining medical consultants (Doc. No. 13 at 10–14), and (2) the ALJ improperly evaluated the credibility of Ms. Bridges' testimony regarding her pain symptoms (Doc. No. 13 at 14–18).

An individual's RFC demonstrates her ability to do physical and mental work activities on a sustained basis despite functional limitations caused by any medically determinable impairment(s) and their symptoms, including pain. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p 1996. In making a proper RFC determination, the ALJ must consider all of the relevant evidence

in the case record.  20 C.F.R. §§ 404.1545, 416.945.  The record may include medical signs,

diagnostic findings, the claimant's statements about the severity and limitations of symptoms,

statements and other information provided by treating or examining physicians and

psychologists, third party witness reports, and any other relevant evidence.  SSR 96–7p 1996.

"Careful consideration must be given to any available information about symptoms because

subjective descriptions may indicate more severe limitations or restrictions than can be shown by

objective medical evidence alone."  SSR 96-8p.  However, it is the claimant's responsibility to

provide medical evidence showing how her impairments affect her functioning.  20 C.F.R.

§ 404.1512(c).  Therefore, when the record does not support specific physical or mental

limitations or restrictions on a claimant's work-related activity, the ALJ must find that the

claimant has no related functional limitations.  *See* SSR 96-8p.

     1.     <u>The ALJ properly weighed the medical opinion evidence in assessing
Bridges' RFC.</u>

Bridges seeks a remand for further consideration of the medical opinions of Dr. Kennedy

and Dr. Toney.  (Doc. No. 13 at 14).  She contends that the ALJ erred by not assigning

controlling weight to their opinions because they were her treating physicians (*Id.* at 10–14).

She also alleges that the ALJ impermissibly relied upon the opinions of state agency medical

consultants who did not examine her (*Id.* at 14).

In determining the proper weight to accord medical opinions, the ALJ must consider

factors including the claimant's examining and treatment relationship with the source of the

opinion; the physician's specialty; the support provided for the medical opinion; and its

consistency with the record as a whole.  20 C.F.R. § 404.1527(d)(1)–(6).  A "treating source" is

a medical professional who provides medical treatment or evaluation to the claimant and has or had an ongoing relationship with the claimant. 20 C.F.R. § 404.1502. An ongoing relationship exists when the medical record shows that the claimant saw the source frequently enough to be consistent with accepted medical practices for the treatment of the medical condition. *Id.*

An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-8p; SSR 96–2p. Generally, ALJs weigh the opinions of a treating source more heavily because he is more familiar with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, a claimant is not entitled to benefits merely because a treating physician labels her as disabled. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). A medical opinion may be discounted if it is internally inconsistent or inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870. While the ALJ is not required to award a treating physician controlling weight, the ALJ must articulate, at a minimum, his reasoning for not doing so. *Hofslien*, 439 F.3d at 376–77. The ALJ's reasoning should be based on the relevant factors applied to all medical opinions as stated above. *See* 20 C.F.R. § 404.1527(d)(2)-(6).

      a.      <u>The ALJ's finding that Dr. Kennedy's opinions were not entitled to controlling weight is supported by substantial evidence.</u>

In this case, the ALJ accorded only little weight to Dr. Kennedy's December 2005 opinion and minimal weight to his August 2006 opinion (Tr. 47). Bridges argues that the ALJ

simply rejected Dr. Kennedy's opinion that she is disabled without any consideration of other evidence in the record and without sufficiently expressing her rationale (Doc. No. 13 at 12). Prior to her discussion of treating source opinion evidence, the ALJ established that Dr. Kennedy was Bridges' primary physician with an ongoing examination and treatment relationship and that his regular examination findings of positive trigger points were consistent with a diagnosis of fibromyalgia (Tr. 45). When she turned to Dr. Kennedy's two opinions, the ALJ did not dispute the length, nature, and extent of the treatment relationship or the consistency of the record with his diagnosis. However, in considering whether Dr. Kennedy's opinions were entitled to controlling weight, the ALJ did not find sufficient support for Dr. Kennedy's assertion that Bridges was "disabled" (Tr. 46–47). She articulated her rationale for each separate opinion.

In discussing Dr. Kennedy's December 2005 opinion, which stated a diagnosis of chronic thoracic strain, the ALJ noted that the estimated duration of disability from August 1, 2005, to June 2006, only amounted to ten months—two months less than the twelve months required to constitute being "disabled" under the Regulations. *See* 42 U.S.C. § 423(d)(1)(A). The ALJ also mentioned that Dr. Kennedy's opinion included no specific restrictions on Bridges' work activity (Tr. 47). A diagnosis alone does not define the specific limitations that a claimant faces. *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). A claimant, therefore, has the burden to show how her impairments affect her functioning. 20 C.F.R. § 404.1512(c). Dr. Kennedy's opinion does not meet this burden. It fails to support the label of "disabled" that Dr. Kennedy assigned to Bridges. Thus, the ALJ properly considered the relevant factors and sufficiently explained her refusal to grant controlling weight to Dr. Kennedy's December 2005 opinion.

17

The ALJ then turned to Dr. Kennedy's second opinion from August 18, 2006, which she found to be vague and unsupported (Tr. 47).  The ALJ supported her assertion of vagueness by noting that the beginning date of disability, a fact necessary to determine the duration of the disability, was not included in the report (*Id.*).  Bridges implies that the August 1, 2005, disability onset date from Dr. Kennedy's December 2005 opinion still applies (Doc. No. 13 at 12).  Yet nothing in Kennedy's August 2006 report accounts for Bridges' disability status between June 2006 (the estimated end of her disability in the December 2005 report) and August 18, 2006.  Therefore, the August 2006 opinion fails to support an August 1, 2005, onset date.  The ALJ further supports her claim of vagueness in Dr. Kennedy's assessment by noting his responses to two questions regarding the duration of Bridges' disability (Tr. 47).  Dr. Kennedy simply marked the estimated disability duration box labeled "12-?" months, and responded to the question of whether Bridges was permanently disabled by marking "unknown at this time" (*Id.*).  The ALJ also noted that like the December 2005 opinion, this report included no specific restrictions or limitations on Bridges' activity (*Id.*).  Again, the ALJ properly considered the relevant factors and effectively explained her reliance on the lack of support for Dr. Kennedy's opinion in deciding to accord only minimal weight to the August 2006 opinion.

b.      <u>The ALJ's finding that Dr. Toney's opinion was not entitled to controlling weight is supported by substantial evidence.</u>

The ALJ accorded only limited weight to Dr. Toney's October 21, 2008, opinion describing Bridges' functional limitations (*Id.*).  Bridges argues that Dr. Toney was a treating physician whose opinion deserves controlling weight and that the ALJ provided insufficient reasons for rejecting Dr. Toney's opinion (Doc. No. 13 at 12–14).  Specifically, Bridges asserts

that the ALJ should have considered more factors than the short duration of her treatment relationship with Dr. Toney in assessing the proper weight to accord his opinion (*Id.* at 13–14). In addition, Bridges challenges the ALJ's reliance upon a lack of objective imaging to support Dr. Toney's diagnosis (*Id.* at 12–13).

The ALJ correctly points out that Bridges only visited Dr. Toney once, on June 20, 2008 (Tr. 47). While Dr. Toney did examine, diagnose, and prescribe medication for Bridges on that day, the record at the time of the hearing and the date when the ALJ issued her decision included only the single visit and the completed October 2008 medical opinion (Tr. 374–80, 396). Bridges' arguments that Dr. Toney was her primary physician after Dr. Kennedy retired in 2007 and as such was familiar with her conditions are consequently of limited value given the brief contact between Bridges and Dr. Toney included in the applicable record. With only one examination of Bridges, Dr. Toney could not have obtained the longitudinal picture of her impairments that could have justified granting greater weight to his opinion. *See* 20 C.F.R. § 404.1527(d)(2)(i). Therefore, the ALJ properly considered the short duration of the treatment relationship in determining the proper weight for Dr. Toney's opinion.

The ALJ also considered the medical evidence available to support Dr. Toney's opinion in determining how to weigh it. *See* 20 C.F.R. § 404.1527(d)(3). The ALJ found that Dr. Toney's opinion was worthy of only limited weight because his opinion was not sufficiently supported by objective examination findings (Tr. 47). First, the ALJ found that there was insufficient objective imaging evidence to support Bridges' primary diagnosis of osteopenia or any other significant musculoskeletal pathology (*Id.*). In her brief, Bridges does not address Dr.

Toney's osteopenia diagnosis at all, but instead cites the ALJ's finding and accuses the ALJ of misunderstanding the role of imaging in diagnosing fibromyalgia and headaches (Doc. No. 13 at 12–13). While it is true that fibromyalgia and migraines cannot be diagnosed effectively using diagnostic imaging tests, osteopenia can be with a bone mineral density test[7], making the ALJ's reference valid. Second, the ALJ noted that Dr. Toney's opinion and treatment notes lacked objective evidence to support Bridges' fibromyalgia and migraine diagnoses. As the claimant suggests, trigger point analysis likely represents the only discernible medical sign of fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *Liscano v. Barnhart*, 230 F. Supp. 2d 871, 885 (N.D. Ind. 2002). However, Dr. Toney never noted results of a trigger point analysis. In addition, he did not report the frequency, intensity, or other specific symptoms associated with Bridges' headaches. Instead, his treatment notes merely reflect Bridges' subjective complaints (Tr. 374–80). Because subjective complaints alone cannot support a medical opinion, the ALJ properly discounted Dr. Toney's opinion. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

Bridges also argues that the ALJ should have given greater consideration to the consistency of Dr. Toney's opinion with Dr. Kennedy's (Doc. No. 13 at 13–14). According to Bridges, Dr. Kennedy's opinion was that "Ms. Bridges [could ]not perform any sustained work" (*Id.* at 14). As discussed above, Dr. Kennedy's opinion specifically indicated that there were no restrictions on Bridges' work activity. Dr. Toney's statement of limitations, therefore, is not consistent with Dr. Kennedy's opinion and this argument holds no merit. For these reasons, the

---

7       *Osteopenia-Overview*, *supra* note 6.

Court finds that the ALJ properly supported her decision to limit the weight of Dr. Toney's medical opinion with substantial evidence from the record.

> c.     The ALJ's adoption of Dr. Reiners's and Dr. Lavallo's RFC determination is supported by substantial evidence.

The ALJ adopted the RFC determination in Dr. Lavallo's medical consultant opinion on December 27, 2006 (Tr. 47). It affirmed Dr. Reiners' opinion from October 5, 2006 (Tr. ??). Both Dr. Reiners and Dr. Lavallo were non-examining physicians who reviewed the claimant's medical records at the request of the Social Security Administration. The doctors agreed and the ALJ noted that Bridges retained the capacity to perform work at the light exertional level as defined in 20 C.F.R. § 404.1567(b) with some additional limitations. She could only perform occasional postural maneuvers, could never climb ladders, ropes, or scaffolds, and had to avoid concentrated exposure to workplace hazards including unprotected heights and moving machinery (Tr. 47).[8] The ALJ also considered the effects of Bridges' mental impairment and further limited her to work that does not require a fast pace or have strict quotas, which exceeded the recommendations of Dr. Reiners, Dr. Lavallo, and two consultative psychologists (Tr. 49).

Bridges challenges the ALJ's reliance on Dr. Reiners' and Dr. Lavallo's opinions based on their status as non-examining medical consultants (Doc. No. 13 at 14). Bridges specifically contends that the doctors are not specialists in fibromyalgia or migraines; they reviewed a "severely undeveloped record" containing only evidence from Dr. Dickey's one-time examination of Bridges; and their evaluations only considered the record up until December 2006, almost two years before Bridges' hearing (*Id.*). The ALJ must consider the findings of

---

[8]     Dr. Reiners and Dr. Lavallo reported more limitations on Bridges's work than Dr. Bastnagel, who stated in March 2006 that she could perform light work with only occasional postural movements  (*See* Tr. 290–97).

non-examining, medical consultants as opinion evidence and evaluate their findings using the relevant factors stated above. 20 C.F.R. § 404.1527(f)(2)(i)–(ii). Therefore, the claimant correctly seeks consideration of Bridges' examining relationship with the two doctors; the specialties of the two doctors; and the supportability and consistency of their opinions compared to the record as a whole.

However, the ALJ provides substantial evidence to support her decision to adopt the RFC determination stated in Dr. Lavallo's December 2006 opinion. The ALJ explained that the December 2006 RFC fully addresses any limitations due to Bridges' back pain, migraines, and fibromyalgia (Tr. 48). Dr. Toney was the only medical source to present different limitations. However, his 2008 opinion was discounted as discussed above giving the ALJ no reason to incorporate his stated restrictions. Furthermore, the ALJ's statement is consistent with evidence from the examining sources—Dr. Kennedy, a general practice physician; Dr. Kahn, a rheumatologist; Dr. Blankenship, a neurologist; and Dr. Dickey, an internist—none of whom identified any specific functional limitations. The ALJ further explained that the record showed no evidence of a significant decline in Bridges' physical capacity since December 2006 (Tr. 48). The ALJ specifically noted evidence showing that Bridges' migraines had improved since December 2006 (*Id.*). The ALJ also pointed to Bridges' failure to initiate an exercise program as prescribed by her rheumatologist in 2008 and her apparent choice to treat her conditions solely with pain medications (*Id.*). In order to receive disability benefits, a claimant must follow prescribed treatments that could restore her ability to work. 20 C.F.R. § 404.1530(a). Therefore, Bridges' lack of compliance is important evidence that the ALJ properly considered. For these

reasons, the ALJ's adoption of Dr. Lavallo's December 2006 RFC assessment is supported by substantial evidence consistent with the record as a whole.

In summary, the ALJ properly weighed the medical opinion evidence of Dr. Kennedy, Dr. Toney, and the non-examining medical consultants. The ALJ provided substantial evidence to support her decision not to give controlling weight to Dr. Kennedy's opinions based on the lack of support for his assertion that Bridges was "disabled," the vague durational statement, and Dr. Kennedy's lack of limitations on Bridges' work-related activity. The ALJ also provided substantial evidence to support her decision not to give controlling weight to Dr. Toney's opinion based on the lack of an ongoing treatment relationship and his lack of objective findings. And lastly, the ALJ provided substantial evidence to support her adoption of the RFC determination in Dr. Lavallo's December 2006 opinion based on its consistency with the record as a whole.

2.    The ALJ's credibility determination was not patently wrong.

Bridges challenges the ALJ's credibility determination asserting that she applied the wrong legal standard in assessing Bridges' credibility and that she failed to give adequate reasons for finding Bridges' testimony not credible. Bridges' main claim is that she suffers from pain due to migraines and fibromyalgia. In assessing a claimant's subjective symptoms, particularly pain, the ALJ must follow a two-step process. SSR 96-7p. First, the ALJ must determine whether there is a medically determinable impairment that can be shown by

acceptable medical evidence and can be reasonably expected to produce the claimant's pain or other symptoms. SSR 96-7p. Second, after showing an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of the impairment to determine the extent to which the symptoms limit the claimant's ability to work. SSR 96-7p. Whenever a claimant's statements about the symptoms and limitations of their impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on consideration of the entire case record. SSR 96-7p.

An ALJ's decision regarding a claimant's credibility must contain specific reasons for the finding on credibility, be supported by evidence in the record, and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the ALJ gave to the claimant's statements and the reasons for that weight. SSR 96-7p. Because an ALJ is in a special position to hear, see, and assess witnesses, her credibility determinations are given special deference and will only be overturned if they are patently wrong. *Shideler v. Astrue*, 2012 WL 2948539, at *4 (7th Cir. July 20, 2012). An ALJ's credibility determination will only be considered patently wrong when it lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

In determining the credibility of Bridges' testimony regarding the symptoms associated with her pain, the ALJ concluded that her medically determined impairments could reasonably be expected to cause the symptoms she alleged in her testimony (Tr. 43). However, the ALJ found that her "statements concerning the intensity, persistence, and limiting effects of these

symptoms [were] not credible to the extent that they [were] inconsistent with the above [RFC]" (*Id.*).  Bridges contends that the ALJ improperly evaluated the consistency of Bridges' testimony against the RFC instead of the evidence in the record (Doc.No. 13 at 16).  As the claimant correctly states, the Seventh Circuit in *Bjornson v. Astrue* rejected an ALJ's use of the exact same boilerplate language used in this case.  671 F.3d 640, 644 (7th Cir. 2012).  However, the court in *Bjornson* criticized the ALJ not for the form of the boilerplate language but for the ALJ's failure to link his conclusion to evidence in the record.  671 F.3d at 644.  In this case, the ALJ demonstrated that Bridges' testimony regarding the frequency and limiting effects of her migraines was inconsistent with the medical evidence.

In her testimony at the hearing on October 31, 2008, Bridges stated that she was experiencing two to three migraines a week that debilitated her for an entire day (Tr. 43).  She indicated that this was an improvement from the daily migraines she experienced before taking Topamax (Tr. 43).  She also reported that her migraines were increasing, which she attributed to her other medications (Tr. 43).  The ALJ found this testimony to be unsupported by the medical evidence in the record (Tr. 43).  She supported her conclusion by tracing each of Bridges' reports of headaches to Dr. Kennedy and Dr. Blankenship, her treating physicians, from October 18, 2005, until her last recorded visit with Dr. Blankenship on July 18, 2008 (Tr. 44).  In so doing, the ALJ effectively documented that Bridges' testimony conflicted with her statements to Dr. Kennedy and Dr. Blankenship regarding her headache symptoms.  *See Elder*, 529 F.3d at 414 (affirming ALJ's authority to disregard claimant's testimony because it conflicted with her statements to her doctor).  In addition, the ALJ referenced the record to show the fluctuating

frequency of Bridges' headaches and the lack of evidence that her headaches ever occurred daily during the relevant period (Tr. 44). The ALJ outlined Bridges' medical history in support of her conclusions that at most, Bridges experienced two to three headaches per week, but only for discrete periods of time. (*Id.*) The ALJ also cited to the record to show that Bridges' headaches were decreasing in frequency with treatment rather than increasing as Bridges testified (*Id.*). And lastly, the ALJ's explanation accurately reflected the lack of medical evidence to support Bridges' testimony that her headaches forced her to spend entire days in bed. The ALJ properly evaluated the consistency of Bridges' testimony against the medical evidence in the record.

In her brief, Bridges also suggests that the credibility determination was based the ALJ's finding that "imaging studies of the spine failed to show significant pathology to account for Ms. Bridges' back and fibromyalgia pain" (Doc. No. 13 at 16, *quoting* Tr. 44). Bridges' argument here is unclear. She indicates that she is reiterating the imaging argument she made relative to the weight accorded to Dr. Toney's opinion. However, the quotation Bridges cites on page 44 of the transcript does not discuss the lack of imaging for Dr. Toney's diagnosis of ostepenia. On page 44, the ALJ recited Bridges' treatment from Dr. Jones in 2004, which included x-rays and an MRI prior to the onset of disability date. In addition, the ALJ made no assertion that the lack of imaging evidence contradicts Bridges' hearing testimony so as to limit her credibility. The ALJ merely reported the results of the x-rays and MRI as part of her presentation of Bridges' medical history. She never referenced these tests or Dr. Jones' opinion directly again. Therefore, the ALJ properly weighted the lack of objective imaging reported from the 2004 diagnostic tests.

Because the ALJ's credibility determination did not lack explanation or support, it is not patently wrong. The ALJ effectively articulated reasons for finding Bridges' headache testimony not credible. The ALJ's reasons are properly supported by record evidence and are sufficiently specific to make clear the weight given to Bridges' testimony and the specific reasons for that weight. For this reason, this Court finds that the ALJ's credibility determination must stand.

## III.    CONCLUSION

This Court concludes that the ALJ made a proper RFC determination in this case. The ALJ properly weighed the medical opinions of Dr. Kennedy, Dr. Toney, and the consultative examiner and supported her conclusions with substantial evidence. In addition, the ALJ's credibility determination was not patently wrong. Therefore, Bridges' motion to reverse or remand is **DENIED.** This Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is instructed to term the case and enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated this 1st  Day of August, 2012.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge
